Michael R. Spaan, Esq.
mspaan@pattonboggs.com
PATTON BOGGS LLP
601 West Fifth Avenue, Suite 700
Anchorage, Alaska 99501
Telephone: 907-263-6300
Facsimile: 907-263-6345

*Attorneys for Leigh Gilburn*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| LEIGH GILBURN, ) | |
| a.k.a. TAMORY LEE GILL, ) | |
| a.k.a. TAMORY L. GILL, ) | |
| a.k.a. T. LEIGH GILL, ) | No. 3:06-cr-00058-JWS |
| a.k.a. LEIGH GILL, ) | |
| ) | **SENTENCING MEMORANDUM** |
| Defendant. ) | **OF DR. LEIGH GILBURN** |

### I.      INTRODUCTION

Determining an appropriate sentence is difficult under any circumstances. However, this case is more difficult than most. Dr. Gilburn stands before this Court approximately ten years after realizing her dream of becoming a physician and providing care to those who need it most – primarily indigent patients in rural America. Dr. Gilburn has never been in trouble and has led an exemplary life except for the events which lead to this sentencing. The Presentence Report contains numerous instances of self-destructive letters and actions leading up to the events culminating in this sentencing which Dr. Gilburn acknowledges. Once the Court resolves the issue of why this conduct occurred we are hopeful it can fashion a just sentence that does not destroy an exemplary medical career and would allow Dr. Gilburn to continue providing

51131.07

necessary medical service to those who need it most while satisfying her obligations to the Internal Revenue Service ("IRS"). The sentence recommended on behalf of Dr. Gilburn would only call for a modest three point downward departure in the calculation of the offense level under the new advisory guidelines.

## II.     18 U.S.C. § 3553 ANALYSIS

After <u>U.S. v. Booker</u>, 543 U.S. 220 (2005) the courts have been instructed that the U.S. Sentencing Guidelines, while still an important consideration, are advisory and sentencing should be imposed pursuant to an analysis under 18 U.S.C. § 3353(a). The sentence must be sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

### A.     Nature and Circumstances of the Offense

Dr. Gilburn has pled guilty to a violation of 26 U.S.C. § 7201, Attempted Tax Evasion, a Class D felony. This is a serious matter. The tax system depends, in large part, on the voluntary payment of taxes by the taxpayers. During the course of years Dr. Gilburn sent many letters and took actions designed to defeat her legitimate tax obligations. The explanation for why an otherwise intelligent and law abiding person would engage in such self-destructive conduct does not excuse the conduct, but certainly helps explain it.

### B.     Dr. Leigh Gilburn

#### 1.     Background

Dr. Gilburn currently lives in Bethel, Alaska (since September 1999) and provides medical care to the underserved patients of the Yukon-Kuskowim Delta as a Family Medicine Physician with an emphasis on obstetric care. (Crow letter, Exhibit A.) Her dedication, skill,

character and commitment to patient care is recognized by colleagues and patients alike. (McClure letter, Exhibit B; Anders letter, Exhibit C.)

Dr. Gilburn was born in Mobile, Alabama on September 21, 1960 (PSR § 70). Her father was a civilian employee with the U.S. Army and the family moved frequently. (PSR § 72.) Her parents divorced at the end of her high school years and Dr. Gilburn received counseling during this period of her life. (PSR § 77.) Dr. Gilburn graduated from Nursing School in 1985 and for years had a successful career as a nurse. (PSR § 79.) Dr. Gilburn received a degree in Osteopathic medicine in 1994 and completed her residency in Family Practice in 1997. (PSR §§ 80, 81.) In 1998 she completed a one year training program in high-risk obstetrics. (PSR § 81.)

Since completing her medical training Dr. Gilburn has done what she trained for and aspired to – provide critical medical services to underserved patients in rural locations. While Dr. Gilburn receives an adequate salary, she certainly did not attempt to maximize her compensation by working in Ronan, Montana or Bethel, Alaska, nor did she avoid her obligation to the IRS to live an opulent life style.

2.     The New Gnostic Church

The question that must be addressed is how did this doctor – dedicated to treating the underserved – get embroiled in the mess she created with the IRS? Why? What would prompt her to believe the actions she took with the IRS were anything but self-destructive? (PSR § 13 – 44).[1]

---

[1] Dr. Gilburn objected to § 36 by simply stating she did not recall the activity described in that paragraph. Since that time she has gone through her records and learned that there was not seven checks tendered on April 21, 2003; that most of the cash came from loans from Alaska USA Federal Credit Union and from her safe; and the money was used to pay for siding on her house

The answer is provided in part by Dr. Gilburn in her own words. (PSR § 49.) During 1996, at a time she was in a vulnerable and weak condition, she was referred to James King, the head of the New Gnostic Church by a co-worker.[2] At the time Dr. Gilburn was referred to the New Gnostic Church she was "vulnerable, depressed, on antidepressants, in a troubled relationship, stressed with postgraduate training and sleep deprivation." Id. For a fee of $2,000 James King met with Dr. Gilburn and subjected her to "the process." She spent 10 to 12 hours a day with King over the course of a week. She stopped taking anti-depressants prior to "the process" at the orders of James King.

After completing "the process" Dr. Gilburn felt much better and more equipped to handle the stresses of life.[3] Dr. Gilburn felt she had found someone who could provide the answers she was looking for in her life. Dr. Gilburn remained in the cult, tithed, and attended meetings. She looked to James for answers. She invested in his schemes and was subject to the psychological coercion directed at all cult members. As part of the thought control, the church members were repeatedly told that taxes were voluntary and given instructions on how to challenge the IRS.[4]

In March of 2005 Dr. Gilburn received information that James King was facing pedophile charges, and Don Grahn, the "tax advisor" recommended by the Church, was under IRS scrutiny.

---

to a contractor who wanted to be paid in cash. (Exhibit D.) This explanation does not impact the Guideline calculations.

[2] Most cult members make initial contact with the cult through a friend or relative. Singer, Margaret Thaler, Cults In Our Midst, p. 105. San Francisco: Jossey-Bass, 2003.

[3] Id. at 77 – 78. As part of the change process cult people take on new identities and are "cleared."

[4] To show the influence James King had, he instructed the members that corporate taxes were legal. Dr. Gilburn paid corporate taxes each year she was fighting with the IRS over personal taxes.

In addition, her former partner, Helen Hancken, was telling the IRS that Dr. Gilburn had coerced her not to pay taxes, although she was a member of the same cult as Dr. Gilburn. (PSR § 49.) Confused, frightened and questioning all she had learned the last eight years Dr. Gilburn communicated with former members of the Church and summoned the strength to leave the cult.

Dr. Gilburn's change in behavior because of the cult was observed by her family. (Exhibit E – Tompkins (mother); Exhibit F – Gill (sister).) Both Dr. Gilburn's mother and sister speak of her many good qualities and note the influence "James" and the cult had over her. Her mother and sister observed that Leigh was particularly susceptible to these influences at that time in her life.

Other former members of the New Gnostic Church have written and described the influence James had over their judgment and lives. The documents describe James' persuasive hold and advice about "voluntary taxation" particularly to those who earned "significant amount[s]." (Exhibit G – Davenport; Exhibit H – Gummow.) The purpose of the advice was to leave more available money for tithing and investment in "James'" schemes designed to make him rich.[5] (Exhibit I – Boudrou.) James referred members to specific tax "advisors." (Exhibit J – Benshoof.) The influence of James on cult members as well as his schemes are described by a former cult member Kurt Hettiger. (Exhibit K.) Dr. Gilburn was referred to Don Grahn (J.D. Consultants) for tax advice.

---

[5] During her time as a member of the New Gnostic Church, in addition to regular tithing Dr. Gilburn reports investing much money in various opportunities offered by James King. They included schemes involving long distance internet phone calls, computer sales, vitamin sales and the purchase of gold coins.

### C. Break From the Cult

Dr. Gilburn described in her statement the combination of events which lead to her break with the cult. (PSR § 49.) After extracting herself from the influence of the cult, Dr. Gilburn took the necessary steps to take responsibility for the acts she committed and to start putting her life back in order.

After engaging counsel steps were taken to resolve her issues with the government. Dr. Gilburn entered into a plea agreement which is before this Court. Additionally, Dr. Gilburn filed all past due tax returns (PSR § 91) and is paying on her tax liability. Dr. Gilburn also paid off the tax lien of $110,934.01 plus $33,000 in criminal investigation costs. (PSR § 35, Exhibit L – Satisfaction of Lien.)

After separating herself from the cult Dr. Gilburn also cooperated with law enforcement personnel in their investigation of James King (founder of the New Gnostic Church) and Don Grahn (tax advisor she was referred to by the Church). Although it appears the federal investigation against James King has stalled, Washington state officials were successful in building a case against King in which Dr. Gilburn supplied valuable information. (Exhibit M.) Dr. Gilburn stands ready to assist any state or federal law enforcement official on any matter on which she can be of assistance.

After leaving the New Gnostic Church, Dr. Gilburn's personal life also improved. After ending a troubled relationship she met and entered into a domestic partnership with Deborah L. Gilburn who had a child, Broedy Gilburn. (Exhibit N – photograph). Dr. Gilburn legally adopted Broedy in February 2006. Leigh, Deborah and Broedy would like to move to Minnesota later this year if this Court imposes a sentence that does not require incarceration. If Dr. Gilburn

is in custody Deborah and Broedy must move to Minnesota so Deborah can satisfy her obligations under the National Health Service Scholarship Program (PSR § 89A).

Dr. Gilburn has been given an opportunity to practice in a rural clinic in International Falls, Minnesota. International Falls is 300 miles north of Minneapolis – St. Paul and sits on the Canadian border. The clinic needs dedicated physicians with excellent obstetric skills. Dr. Gilburn is desperately needed now. If the sentence imposed by this Court allows, it is Dr. Gilburn's intent to accept the position in part to be close to Deborah and Broedy. (Exhibit O – Hart/Johnson.)

Recently Dr. Gilburn has been involved in weekly counseling to better understand what factors made her vulnerable to a cult and to deal with the sense of hurt and betrayal she was left with. The attached affidavit from Darrell Provinse, who is currently counseling Dr. Gilburn, attests to her manipulation by the cult and her efforts to heal and avoid any future involvement with cults such as the New Gnostic Church. (Exhibit P.) While many employment opportunities will be foreclosed because of her felony conviction Dr. Gilburn has the opportunity to treat the underserved and continue her critical work as a highly skilled physician in a rural market if a sentence can be imposed that does not prevent her from relocating to International Falls in the immediate future.

## III.   THE NEED FOR THE SENTENCE IMPOSED

### A.   Just Punishment

Under 18 U.S.C. § 3553(a)(2) the Court must impose a sentence which reflects the seriousness of the offense, promotes respect for the law and provides just punishment. Tax offenses are serious offenses. Dr. Gilburn does not argue she should be excused from her

offenses because of the control and direction of the cult, only that these unique circumstances should be taken into consideration in fashioning a just punishment.

A felony conviction of a professional is a major punishment and deterrence to others. Dr. Gilburn, though hopeful she can continue to practice medicine, realizes she will suffer a drastic reduction in employment opportunities. As a hunter, she will be unable to possess a firearm and will lose other important federal benefits. A sentence of probation combined with home detention and community service would impose appropriate punishment and supervision for Dr. Gilburn and would deter others.

Dr. Gilburn proposes a community service idea which is quite innovative. Dr. Gilburn is an enthusiastic dog musher and currently has a team of dogs in Bethel. She would like to move the team to International Falls and participate in a program to introduce dog mushing to special needs children. If the Probation Office could work with this innovative program it would be a tremendous benefit to the community. Another community service could be speaking to community groups about the danger of cults using her own actions as an example.

With Dr. Gilburn's medical training there are certainly many traditional community service options available to the Court and probation should her own proposals not be feasible.

Dr. Gilburn still faces a tremendous tax obligation as well as other debts. A sentence of home detention and community service followed by a period of supervised release would allow her to satisfy her financial obligations over time. Dr. Gilburn agrees with the Probation Department that a fine is probably not appropriate in this case. The sentencing goal is to impose a just punishment, not one that would financially ruin the Gilburns. Dr. Gilburn will be working a long time to satisfy her obligations including back taxes, interest and penalties. (PSR § 95.)

### B. Rehabilitation of the Defendant

Dr. Gilburn is an intelligent professional who has dedicated her life to public service. She was never in trouble with the authorities prior to joining the New Gnostic Church. Her actions have resulted in a life changing felony conviction and will require many years of hard work to repay the IRS.

Once Dr. Gilburn broke from the cult she took extraordinary rehabilitation steps to file her tax returns, extinguish the IRS lien and make payments on her tax liability to the IRS. She has also cooperated with law enforcement to help with investigations of the leaders of the New Gnostic Church. She is also involved in counseling to further learn from her mistakes.

If any further rehabilitation is necessary it can be obtained by home detention, community service and her continued strides towards satisfying her financial obligations to the government. A term of supervised release will assure that Dr. Gilburn continues to be a good citizen.

### C. Protection of the Public

Dr. Gilburn's one transgression with the law involved her failure to meet her tax obligations. She has taken extraordinary steps to close that ledger. A probation term of home detention and community service followed by supervised release will adequately protect the public.

## IV. GUIDELINE COMPUTATIONS

### A. Introduction

The Sentencing Guidelines are a relevant factor under 18 U.S.C. § 3553(a)(4)(A)(1). Both parties and the Presentence Report are in agreement that a total offense level of 13 is correct under the advisory guidelines. While the parties agree with the computation as far as it

goes, Dr. Gilburn disagrees that there is no available information that would warrant a modest departure. (PSR § 113.)

The Presentence Report computations would give Dr. Gilburn a guideline sentencing range of 12 – 18 months in jail. While Dr. Gilburn realizes the Guidelines are advisory she maintains the Guidelines analysis omits several relevant and present bases for downward departure that should be reviewed as part of the Court's analysis.

  **B.**  **Aberrant Behavior**

The Sentencing Guidelines address aberrant behavior departures in §5K2.20 stating:

  (a)  IN GENERAL.—Except where a defendant is convicted of an offense involving a minor victim under section 1201, an offense under section 1591, or an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code, a downward departure may be warranted in an exceptional case if (1) the defendant's criminal conduct meets the requirements of subsection (b); and (2) the departure is not prohibited under subsection (c).

  (b)  REQUIREMENTS.—The court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life.

  (c)  PROHIBITIONS BASED ON THE PRESENCE OF CERTAIN CIRCUMSTANCES.—The court may not depart downward pursuant to this policy statement if any of the following circumstances are present:

    (1)  The offense involved serious bodily injury or death.

    (2)  The defendant discharged a firearm or otherwise used a firearm or a dangerous weapon.

    (3)  The instant offense of conviction is a serious drug trafficking offense.

>       (4)     The defendant has either of the following:
>               (A) more than one criminal history point, as
>               determined under Chapter Four (Criminal History
>               and Criminal Livelihood) before application of
>               subsection (b) of §4A1.3 (Departures Based on
>               Inadequacy of Criminal History Category); or (B) a
>               prior federal or state felony conviction, or any other
>               significant prior criminal behavior, regardless of
>               whether the conviction or significant prior criminal
>               behavior is countable under Chapter Four.

None of the specific prohibitions described in the Guidelines apply to Dr. Gilburn. This was a non-violent offense. Dr. Gilburn has no criminal history. Prior to Booker when the Guidelines were mandatory the Ninth Circuit Court of Appeals recognized aberrant behavior as an acceptable basis for departure. United States v. Dickey, 924 F.2d 836, 838 (9th Cir. 1991), cert. denied, 502 U.S. 943 (1991).

Both this Memorandum and the Presentence Report conclude the conduct occurred over time. It started shortly after Dr. Gilburn joined the New Gnostic Church and ended when she left. The criminal occurrence was limited to Dr. Gilburn's interaction with the IRS because of the influence of the cult had on a person who was vulnerable, naïve and troubled emotionally. The offense was limited to the bad judgment of Dr. Gilburn in giving up control of her own actions to a group she thought could provide the answers missing in her life.

The Guideline application note #3 allows the Court to consider the defendant's "(A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." All these circumstances were discussed earlier. The Guideline notes were revised in 2000 to resolve the split in the circuits in determining whether a single act can include multiple acts over time. The Guidelines took a position somewhere in the middle. A single criminal transaction is

broader than a single act but is limited to offenses (1) committed without significant planning; (2) of limited duration; and (3) that represent a marked deviation from a law-abiding life. United States v. Guerrero, 333 F.3d 1078 (9th Cir. 2003).

Dr. Gilburn committed acts at the direction of the New Gnostic Church. Once the independent judgment of Dr. Gilburn was overcome the criminal transaction of impeding the IRS was complete. There was no planning – Dr. Gilburn sent the documents she was provided and responded as she was directed.

### C.   Coercion and Duress

The Sentencing Guidelines address downward departures for coercion and duress in §5K2.12. The section states:

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. Notwithstanding this policy statement, personal financial difficulties and economic pressures upon a trade or business do not warrant a downward departure.

The Guidelines state "[o]rdinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party …." Dr. Gilburn submits this is not the ordinary case and the coercion she was subjected to was particularly extreme.

The affidavit from Darrell Provinse, the letters from Dr. Gilburn's family, as well as other former members of the New Gnostic Church clearly demonstrate the power James King had over Dr. Gilburn and other cult members. To demand and instruct Dr. Gilburn and others not to pay individual income taxes because they were "voluntary" for the self-serving motive of assuring more funds were available to tithe and his self-dealing schemes was clearly illegal. To refer Dr. Gilburn to Don Grahn for the purpose of providing guidance and documents to send to the IRS was part of the illegal conspiracy. The affidavit of Kurt Benshoof also established that James King was additionally a sexual predator. (Exhibit J.)

Dr. Gilburn was coerced at a time she was especially vulnerable and subjected to a program of conditioning and thought control. (Exhibit P, Darrell Provinse Affidavit). See, Singer, Margaret Thaler, Cults in Our Midst, p. 52–82. There is sufficient evidence that Dr. Gilburn was under the influence of a cult and that influence strongly contributed to her criminal acts. (Duress or coercion must have a causal connection with criminal offense.) U.S. v. Sammoury, 74 F.3d 1341, 1346 (DC Cir. 1996).

### D.   Combination of Factors

The Unites States Supreme Court in Koon v. United States, 518 U.S. 81 (1996) described a framework for the court to use in analyzing departures:

1. What features take the case out of the "heartland" of Sentencing Guidelines offenses and make the case special or unusual?

2. Has the Sentencing Commission forbidden departures based on these aspects?

3. Has the Commission encourage departures based on these aspects?

4. Has the Commission discouraged departures on these aspects?

Following Koon numerous courts have approved downward departures in cases that fall outside of the "heartland" of guideline offenses. Counsel submits Dr. Gilburn's case is such an exceptional case.

The Guidelines recognize that a downward departure is authorized when a combination of characteristics or other circumstances exist. USSG §5K2.0. In addition to the basis for departure discussed above additional other grounds exist for departure because of diminished capacity (USSG §5K2.13)[6], employment related contribution (USSG §5H1.11) and substantial assistance to authorities (USSG §5K1.1).[7]

The combination of factors demonstrate that this is an exceptional case. Even if the Court had a problem with any one factor, the combination of circumstances warrants a downward departure.

### E.    Analysis

After Booker the Guidelines are advisory. The Court does not need to find grounds existed to warrant departure to impose a sentence of probation with home detention and community service followed by supervised release. The analysis is provided to the Court to demonstrate even under the "mandatory" guidelines the Court would have been allowed to impose a "just punishment" with only a modest downward departure.

---

[6] The analysis under the diminished capacity departure is similar to that of the coercion/duress analysis. The same documents and affidavits illustrate Dr. Gilburn was suffering from a significantly reduced mental capacity impacting her understanding of the wrongfulness of her behavior and/or impacting her exercise of reason. United States v. Menyweather, 447 F.3d 625, 631 (9th Cir. 2006).

[7] Dr. Gilburn has contacted federal prosecutor and FBI agents offering to help in the investigation of James King and Don Braun for their crimes. To date there has been little interest in these potential individuals. She has already assisted Washington State Investigators. (Exhibit M).

## V.     DR. GILBURN'S SENTENCING REQUEST

Dr. Gilburn pled guilty to attempted income tax evasion. This is a serious offense for which Dr. Gilburn has accepted responsibility. The briefing, affidavits and letters demonstrate the control she was subject to as a member of the New Gnostic Church only explains her actions, it does not excuse them. Dr. Gilburn could have defended herself at trial with the defense of duress. She chose not to. The consideration of coercion or distress in sentencing is broader than the defense of duress. United States v. Henderson-Durand, 985 F.2d 970, 976 (8th Cir. 1993).

Dr. Gilburn is healthy, employable and has an opportunity to perform public service in an area that desperately needs her services. Dr. Gilburn requests a term of probation with special conditions of home detention and community service. Under the old mandatory guideline regime the Court would have had to find grounds for only a 3 point downward departure. As discussed above, Dr. Gilburn submits those circumstances are present and compelling. Even under the sentencing program set in place after Booker, the Court is still required to consult the Guidelines for advice as to the appropriate sentence. U.S. v. Kimbrew, 406 F.3d 1149, 1152 (9th Cir. 2005).

A sentence considering 18 U.S.C. § 3553 (a) factors would allow a sentence of probation with special conditions of home detention and community service. A sentence which allows Dr. Gilburn to provide a necessary public service, be close to her family, pay her obligations to the IRS while limiting her freedom and monitoring her actions is a just sentence.[8]

---

[8] An eight level departure for a defendant who embezzled money from the United States Attorney's Office was upheld both under a guideline and 18 U.S.C. § 1353 analysis. The departure dropped the defendant's sentence from a 21–27 month range to a sentence of probation with some limited weekend jail time. The grounds for departure under the Guidelines was diminished capacity (USSG §5K2.13) and family circumstances (USSG §5H1.6). The court also found the imposed sentence was reasonable. U.S. v. Menyweather, 447 F.3d 625 (9th Cir. 2006).

The sentence as outlined above would consider the "nature and circumstances of the offense" as well as the "history and characteristics of the defendant," the "need for the sentence imposed," and a sentence which includes just punishment, deterrence, public safety, rehabilitation, the kinds of sentences available and applicable guidelines. Such a sentence would be reasonable based on the circumstances regarding Dr. Gilburn which have been placed before this Court.

DATED at Anchorage, Alaska this 5th day of October, 2006.

By: s/Michael R. Spaan
Michael R. Spaan
PATTON BOGGS LLP
601 West Fifth Avenue, Suite 700
Anchorage, Alaska 99501
Phone: (907) 263-6300
Fax: (907) 263-6345
Email: mspaan@pattonboggs.com
Alaska Bar No. 7305026

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5TH day of October, 2006, a true and correct copy of the foregoing document was served electronically on the following:

**Lea A. Carlisle**
Trial Attorney
Department of Justice, Tax Division
lea.a.Carlisle@usdoj.gov

**Thomas C. Bradley**
Assistant U.S. Attorney
222 W. 7th Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Thomas.Bradley@usdoj.gov

A true and correct copy of the foregoing document was served via hand delivery on:

**Scott E. Kelly**
**U.S. Probation / Pretrial Service Office**
222 West 7th Avenue, Room 168
Anchorage, Alaska 99513-7562
By:        s/Gloria Bullock
           Legal Secretary/Assistant
           PATTON BOGGS LLP